Okay, our last case today consists of a two consolidated appeals, numbers 24-12787 and 24-12925, Keith Edwards v. Officer Grubbs and the City of Atlanta. So, Mr. Melton, you're going to go first. Thank you, Your Honor. Harold Melton here. I'm with the law firm of Troutman Pepper Lock. I'm here with Elizabeth Walbazer with our firm representing both the City of Atlanta and Officer Grubbs. I want to start out by articulating why, in fact, Officer Grubbs was entitled to qualified immunity contrary to the District Court's findings. The District Court determined there was... Now, wait. Can I ask you a procedural question? There were no specific factual interrogatories to the jury in this case, right? Correct. Right, because one of the ways our circuit says that you can present qualified immunity at the tail end of a case, because you can do it at various stages, is by asking the jury to answer certain factual interrogatories. And then once those are answered, have the judge decide whether or not, based on those facts, there's entitlement to qualified immunity. All we have here is a general verdict, right? Correct. Okay. Correct. We'll go right ahead. So, as to the establishment of clearly established law on the question, the District Court relied on Bradley v. Benton as establishing the principle for which the reasonable officer would know that his conduct was plainly unlawful and unconstitutional. There are two problems with the reliance on that case. The first is that at the time of Officer Grubbs' actions, that case did not exist. That case... It doesn't matter, unfortunately, for you. And that doesn't mean you lose on the qualified immunity issue, but the events in that case took place in 2015. And we said in 2021 or 22 that the facts were clearly established as of the date of the violation, both on obvious clarity grounds and other grounds. So, I'm not sure the date stuff helps you too much, because if we hold that the law was established as of 2015 and the events here took place in 2020 whatever, then temporally that distinction doesn't help you much. I understand the Court's point. I will point out that the real question, as I understand it, is what did Officer Grubbs have to look at? And at the time, he did not have the Brantley case, but as I understand the Court's point, the principles articulated therein were clearly established perhaps. Well, one of the holdings in that case is that it was an obvious clarity violation. So, if it's an obvious clarity violation in 2015, why isn't it an obvious clarity violation here in 2020 something? And the answer to that question is because the facts are just completely different. And the facts are in the Brantley case, and in the cases that they rely on, you have somebody who is in an elevated circumstance, feet not on the ground. In the Brantley case, the defendant, the victim, was fleeing and he was climbing on top of an eight-foot wall. He's on the top of an eight-foot wall, known hazard underneath, and he's tased and knocked down off the wall. And here you're going down an embankment. A hill. He's on the hill. Both feet. So, he's in an elevated position. Both feet on the ground. No, both feet on the ground. Solid ground. In an elevated position. Here's what we don't have. You lose all sense of control when you are tased. That's one of the justifications for not giving qualified immunity in the Benton case. And when you shoot somebody with a taser as that person is fleeing down a hill, you have to know that that person is going to lose control and roll down the hill, right? Correct, Your Honor. But what you don't know is, in this case, there's no evidence, there's no contention that the utility box at the bottom of the hill is even visible. But didn't he know that there was a street down there? Didn't the officer know that? Because one of his concerns was, as the officer indicated, was that he wanted to stop him before he got into the traffic. So, clearly, he knew that there was a street down there, a concrete street. The street was in the other direction. When he fell, he rolled away from the street. And so, the cases that Benton relied on are cases where somebody's on a second-story window, is on a 10-foot ledge, there's a roof ledge, an 8-foot fence. So, what we have to say, that there's a clear established principle that where you have somebody who's non-compliant, whose both feet are on the ground, and that you cannot tase them because they will roll downhill and not hit, whether you know they'll hit something or not. The idea that they'll roll down the hill means that it was clearly established that you cannot tase. And, in fact, our case law at the time said just the opposite. At the time that Mr. Blassingame was fleeing, there are three options available for Officer Grubbs. He could shoot him, which we know is not really an option at all. He could tase him, or he could tackle him. And we had case law that says an arrestee who appears hostile, using a taser to subdue an arrestee, is generally preferable. So, the case law actually encouraged use of a taser in that situation. There is no constitutional principle today, or even at the time, that encourages or even requires Officer Grubbs to let Mr. Blassingame get away. Let me ask you, counsel, though, was Mr. Blassingame even an arrestee at the time? I mean, I think maybe panhandling may have been something that the officer was considering, but from what I recall reading, he wasn't even an arrestee at the time of the tasing, nor was it ever announced that, stop, you're going to, oh, I'm going to tase you. He was going to be apprehended once he started fleeing. Now, he gave him directions to stop, and he was non-compliant, and he fled. So, he was not an arrestee at the time of the tasing? He was not an arrestee, but he was, when he started fleeing, well, I don't know the answer to that, because when he started fleeing, he absolutely had the right to apprehend. For panhandling? For panhandling. And here's the other part, Your Honor. There is, and the district court focused somewhat on whether it was of non-violent offense or not, for which he would be arrested or apprehended. There is not a constitutional rubric that says that we gauge the ability to apprehend based on the severity of the underlying offense. But doesn't, isn't that a factor? I mean, yeah, but isn't that one of the factors that the court considers? Not for establishment of clearly constitutional standard. Okay, I agree with that. Officer Grubbs would have to know from a clearly established constitutional standpoint that for this type of offense, I can't tase. I can't tase. And so, the principle... No, no, no. That's not what we have here. I can't tase for this offense under these circumstances. That doesn't mean you're wrong on qualified immunity, but it's just, it's in the same way that they can't point to a very general abstract right. You can't point to a general right of a police officer to use a taser. Of course, a police officer can use a taser. I accept that. Just like a police officer can use a firearm and discharge it and use deadly force. The question is, under what circumstances? I agree with that, Your Honor. And I really meant the cap set in terms of under these circumstances, where you have a noncompliant arrestee or somebody who's going to be apprehended, who is, who... Okay, in Benton, you had a noncompliant person, right? Yes, Your Honor. Who was fleeing? Yes, Your Honor. Who was not obeying? Yes, Your Honor. Taser used? Yes, Your Honor. Person in a vulnerable position? And that's where I would say, I would take issue. No, no, no, no, no, no. But yes. I'm talking about Benton. I'm talking about Benton. Yes. I would describe it differently. Yes, Your Honor, but it was a vulnerable position. I would describe it differently. So here, everything is the same except, you say, the vulnerable position? Yes, Your Honor. Why was he not in a vulnerable position? The degree of the vulnerable position. So being on top of... No, no, not degree. You said vulnerable position. That's why I was, that's the distinction I was making with your court, with this court's representation. I would say that being on a fence, being on top of this podium is different than being on a hill. This gentleman was able to run up the hill, and people roll down hills all the time. And without injury... Not very well. Without very... And I would say, I would suggest this. Have you seen the old ESPN? I have seen those. Things of people rolling down hills, like in Scotland and Ireland. It's not a pretty sight. And those people are trying to roll down the hill. They are trying to roll. And I would suggest this, Your Honor, but for that utility box at the bottom of the hill, we wouldn't be having this conversation at all. You're not saying that. That's not true. You may not have the damages at issue that are placed here, but if he rolled down the hill and dislocated an arm and broke a leg and punctured a lung, you'd be here too. You just wouldn't have a $20 million judgment against you. The argument is the use of excessive force. That's correct. And it's being judged by hindsight based on... No, no, no. You're trying to argue that the damages verdict shows that the law was not clearly established, but that's not true because you take a tort plaintiff as you find them, and that plaintiff is usually entitled to recover for the natural consequences of the tort. So the fact that he got a $20 million verdict is based on the fact that unfortunately he fell down and hit the metal utility box that was in a concrete embankment. If he had fallen down and not hit anything but broken an arm, dislocated a femur, punctured a lung, you'd still have an excessive force claim. And the claim would be the same except you'd have less damages exposure. Well, Your Honor, I see I'm running out of time. Go right ahead and talk. However, I do want to say there has not been a case where someone has been tased with both feet on the ground and it's been held to be excessive force. What was the steep, the grade of the hill? That's not really articulated in the record, Your Honor. There's no... I know the police officer turned off his camera and then turned it back on, but tell me what the camera showed about the grade. Here's what I can tell you, Your Honor. Mr. Byske was a relatively older man at the time. He was able to run up this hill. He was not climbing a mountain. He was able to run up an incline and then there was a roll down, like the side of an interstate. It wasn't one of these pitches you go up to the exit, but the side of an interstate with an incline and then you roll down. At the bottom of the incline, there's a utility box. Nobody testified how far he rolled down? Excuse me? Nobody at trial testified how far he rolled down? Nobody testified about how far the utility box was? No, Your Honor. That's all I know of. Wow. Okay. All right. Thank you very much. Good morning, Your Honors. Mr. Desmond. Christopher Desmond from Venn-Johnson Law on behalf of the plaintiff, Keith Edwards, as the personal representative of the estate of Mr. Jerry Blazingame. Mr. Edwards is present in the courtroom today. I'm joined at counsel's table by Mr. Venn-Johnson, who was the individual who tried this case to verdict. I also want the court to know for the panel's benefit that there are members of Mr. Blazingame's family in the courtroom today as well. Your Honor, I'm very happy and eager to answer any questions in this case regarding qualified immunity, punitive damages, remitter, because frankly, I believe the law and facts favor us on each and every one of those issues, which might be unsurprising to this panel that I have that personal view. But I want to start today by talking about municipal liability. Can I ask you maybe instead to start just sort of really picking up on the series of questions that Judge Jordan was asking your adversary? Yes, Judge. So I'll take Bradley, sort of the gradient question. I'll take Bradley to be in this kind of case, right? Eight foot straight off the ground on a ledge.  Okay. So Bradley says, maybe back to 2015, clearly established, don't tase, right? Now we're here. We're at a 5% gradient. Should the cop know, can't tase, might roll down the 5% gradient? And tell me when the law clearly establishes that the officer can't tase and what does it? Yeah. So it's an interesting question, Your Honor. To answer a question that I think is related to that, my understanding is that this was about a 45 degree incline, so we're not talking about a five degree gradient. I still understand the court's question. You know, it's an interesting question, Your Honor, and I would say that one of the things in this case that stands out to me is, despite the fact that defense counsel is arguing now this wasn't really an elevation, this wasn't really an elevated height, there's no argument from Mr. Grubbs or any of the police officers associated with this case during the course of trial. Everybody agreed that this, this situation with this gradient that this officer was facing, that this was an elevation, that this was an elevated height, and that all of his training tells him he is not allowed to tase in that situation. But the training, training, training. I understand, like rhetorically that's very powerful. Legally, it is totally irrelevant. Well, so, you know, Judge Nusselt, I understand why you say that, but I do think it's, it's very interesting to me that when we talk about clearly established, and I think this came up in the third case that was argued today. When we talk about clearly established, we generally talk about how, you know, it'd be unfair to hold an officer liable for something that he had no notice he wasn't supposed to do. I think qualified immunity jurisprudence is jacked up in lots of ways. Agreed. I don't think that the current law reflects reality on the ground. However, for good or ill, you know, we say that only the law establishes the law.  Training doesn't. And it, and, and there, and it's only this limited, like, source of, of legal, you know, sort of pronouncement that does. The Supreme Court, us, maybe the, what do we call it? The, the, the persuasive consensus. Right. But not training materials. That might be stupid.  But it is the law. I understand, Your Honor. And I would say, just to answer the court's question very directly, I, I think that that's probably a circumstantial question that sort of goes back to what Judge Jordan was asking. And Judge Jordan, I know you were on the Bradley vs. Benton case, and so you're obviously very familiar with these concepts. And for, in Bradley vs. Benton, the focus was really this idea of, would the officer know that this individual could get injured as a result of falling from the position that they're in? And Judge Newsom, I think that's kind of the answer to your question. If there's a very slight gradient that a fact finder could look at and say, no, that's not a fall risk. That, that's essentially flat ground, or that's near enough flat ground that it's not going to increase the risk that the, the suspect is facing. But in this case, that, that was never an argument that was made. The argument was simply that everybody understood that Mr. Blasingame was running downhill, not uphill. He was running downhill. He was approaching a downhill decline when he crossed over the guardrail. And Mr. Grubbs admits at every moment in this trial, I knew that he was facing a decline. I knew that he was running downhill. I didn't know what was down at the bottom of the hill. And it's so fascinating to me that the defendant continues to latch onto that as if it's a good thing for him. Because the other thing that Grubbs makes clear, and everybody else, including Michael Bonia, who is the head Taser trainer, what they all make clear is that you don't tase when you can't see the landing zone. It's no different than the elevated height standard. It's the idea that if someone falls when they tase, you know, we've all seen these training videos where police officers get tased because they all do it themselves to understand what it does. Every time they do it, they're on flat ground, an officer behind them, and an officer on both sides to control their fall. Because they know that when NMI occurs, which is neuromuscular incapacitation, which is what a Taser induces in someone, you lose all bodily control. And so if the grade... Which I think makes Bradley a no-brainer of a case, right? You lose function, you fall off an eight-foot ledge, you're going to crack something. But it makes, frankly, the five-degree gradient case a no-brainer in the other direction, I think. Maybe, yeah. And here's the problem. Like, as you begin to do this, somehow the officer's got to know, by reference to law on the books, whether that's the right, you know, sort of benchmark or not. But by law on the books, I could tase five degrees ago, can't tase now. So I think you've got to show me, anyway, what law would have put this officer on notice that he couldn't do it then. So I would direct this court to the following passage from Bradley v. Benton. And I apologize, I don't know. It's on page 11 of 12 of my printout, so near the end. I believe this is page 1243. This is a direct quote. Garner clearly established that an officer cannot use deadly force to stop an unarmed man, Mr. Blazingame, who's not suspected of committing a violent crime, Mr. Blazingame, from fleeing on foot, Mr. Blazingame. That's precisely what happened in Garner, and that's precisely what happened in this case. Accordingly, Garner put Officer Benton on notice that he could not use deadly force to stop Robinson from running away on foot. But, I mean, don't you think, just the circumstances of the two cases in Bradley, it's sort of self-evidently deadly that NMI at eight feet off the ground onto concrete is the functional equivalent of shooting the guy? What law establishes that this, likewise, is the functional equivalent of shooting the  So I think another case that this court can look at, in addition to Bradley v. Benton, is its prior decision, and I think it's Harper v. Perkins. There's also a case called Harper v. Davis. It's Harper 1 and Harper 2. Harper 1 was admittedly kind of similar to Bradley in that it was a person who were feet off the ground. They were up in a tree. And when the case came to this court for the first time, it was following a Rule 12b6 motion, and so all this court was looking at was the pleadings. The pleadings said that that individual was at a four-foot height, so not an eight-foot height. Maybe not quite as clear, Judge Newsom, as what you're describing, where in Bradley we know you fall eight feet, you're hurt, right? Maybe a little less clear at four feet. This court had no issue denying qualified immunity at the Rule 12b6 stage, holding that it was clearly established that the force couldn't be used in that instance. Now, admittedly, when the case comes back in Harper 2, after a Rule 56 motion, and it comes out that the guy up in the tree had a gun at his feet, and that the guy up in the tree had pointed that gun at people and threatened people, qualified immunity was granted, and properly so, because those officers were facing a situation where someone faced physical harm. That's the thing that I think we need to kind of be looking at, Judge Newsom, when we talk about this idea, because there's nothing in this record where defendant Grubbs says, yeah, I thought I could have tased someone at an elevated height and that that was okay. He acknowledges it wasn't. He says the reason why he did it was because of exigency. That's the only reason. Not because he wasn't going to get hurt from this fall, or not because there weren't risks associated with what I did, but because of exigency, and specifically— But of course, I take your point, but of course, qualified immunity is an objective standard, right? So, we're not really like shrinking the mind of the officer here, but what a reasonable officer in those circumstances would have done. Sure, yes. You know, one point that I'm really glad I just remembered, because I think it's very important, Your Honors. Not only, and I explained this in the briefing, not only do I think they waive qualified immunity by not raising it until day five of trial, when Anderson v. Creighton from the U.S. Supreme Court says, you do it at the first possible opportunity. You have to, or you should? You should. It doesn't say you have to, but it says you should. I mean, basically, it's your immunity. It's in your interest to raise it at the earliest conceivable. Well, it's in your interest. It's in the court system's interest. It's in the interest of judicial efficiency, the plaintiff's interest, so that they're not wasting resources. Just so I understand, how does that equate to waiver? Well, there's case law provided in my brief that explains that it can amount to waiver if it's not raised until too late of a point of time, and that is kind of a squishy concept of what is too late of a period of time. What it does is, what it does do is mean that we have to view the facts in the light most favorable to your client. Well, absolutely. For a qualified immunity purpose, because- And for every issue in this case. Because there were no special interrogatories, and we get a general verdict. So, I think that, I don't, I'm not sure there's waiver of any kind, but I do think you get now every benefit of every factual inference because of how qualified immunity was raised.  And I appreciate that, Your Honor, and I agree with that. But I would say, I'd like the court to take a look at a second aspect of my waiver argument. Mr. Deering, trial counsel, when he's asked, first of all, why are you just bringing this up today for the first time on day five of trial, his answer is, I don't know. Sorry, Judge, I can't tell you. But, if you go a little deeper in the exchange, there's a portion where Judge Jones says to Mr. Deering, you know, under Bradley v. Benton, it's clearly established that you can't tase someone at an elevated height. Mr. Deering doesn't say that's not our situation. What he says is, I understand that, Your Honor. He recognizes there's a clearly established right when you have an elevated height implicated. What he says is the knowledge in our case is different because Grubbs didn't know there was an elevated height. Well, that's not true. That's not true on the record. And also, when you go back to Bradley v. Benton, there was all sorts of contradictory testimony in that case. The officer was saying, the guy wasn't even on the wall when I tased him. And so, this is a case where the jury was presented with this evidence properly, and you're right, Judge Shorten, we have to take all the reasonable inferences in the light most favorable to the plaintiff, draw all those inferences in favor of our client, and I think when you do so, qualified immunity was properly denied here. I do believe it was waived, but I have no worries about this court getting to the substance of that issue because I think we prevail on it without problem, frankly. How far did Mr. Blasingame fall? I believe it was somewhere in the neighborhood of 20 to 25 feet, Your Honor, and there was a road at the bottom of that hill. There were two roads. This is two roads that sort of have an embankment in between them. Your Honor, it's just out of the interest because of the lack of time with all of the very serious issues we have in this case. I do want to move to municipal liability now, and the reason for that is because I think it's very clear when you look at the answers on the jury verdict form as well as the apportionment of damages in this case. This is a jury that believed that the City of Atlanta was the most culpable defendant in this case. They apportioned three-fourths of the compensatory damages in this case to the conduct perpetrated by the City of Atlanta. The district— In your brief— Yes. And I'll give you a little bit more time, and I'll give the other side a little bit more time. Thank you, Your Honor. I really appreciate that. In your brief, you focus, maybe not exclusively but a lot, on the custom and policy relating to police officers turning off their body-worn cameras. Yes, Your Honor. How is there a causal relationship between that custom and policy and the injury suffered by Mr. Blasingame when Officer Grubbs, according to the testimony, turned off his camera and the buffering mechanism after he had shot the taser? Yes, he turns it off after— He turns it off— So where's the causal connection about his injury and the custom and policy? So, I believe this record is replete with testimony regarding this point, and I want to direct the Court very specifically to a portion of testimony that I obviously won't read into the record today, but pages 1117 to 1124. And this is the testimony from our expert, Tom Titterington. And what Tom Titterington explains during the course of that testimony is, in large part, the theory of this case, that when officers know no one's really watching, no one really cares what we do— Remember, these officers just got these body cams within a year to two years of these events, and so this is a new piece of technology that's affecting the work they do and the way they do their job, and they're surely talking to one another. And I'm sure they're explaining to each other, yeah, we're all annoyed by those cameras. Who wants to wear a camera on them that records everything they do? And they're probably saying, you know what? You can turn them off. The city doesn't mind. And we know that that's true because we get the citywide audit information that shows that while the city had an 80 percent expectation, 80 percent of all events with the public will be recorded, there was 33 percent participation. And that was in the months that was leading from November of 17 to May of 18. Our tasing happens in July of 18. And, Your Honors, one thing that I also want to point out is that— And by the way, our expert, Dr. Scott, Andrew Scott— I thought the tasing here was in 20. No, it was July of 18, Your Honor. Okay. It was July of 18. Our expert testified that there was deliberate indifference on the part of the city of Atlanta as it relates to this body-worn cam policy, and I believe that that deliberate indifference is reflected by their conduct following these events where they don't pull Mr. Grubbs' body-worn camera audit until 2021, three years after the tasing almost, and not until he's being deposed in this case. And he gets up there, frankly, and I don't use this word lightly, he gets up in his deposition and he lies. He lies. He says, my body cam was off because I went to the bathroom at about 12.30 at the start of my shift, turned it off because I didn't want people watching me go to the bathroom. I forgot to turn it back on. We know that's not true. He turned it off after he tased my client. And what both of our police chief experts explain— these are two individuals with nearly 80 years of combined experience in law enforcement— is that body cams are the best witnesses we have in law enforcement now, and that if you have a body cam and you're a good cop, you want that body cam because it's going to exonerate you. But the inverse of that is that body cams also catch you when you're a bad cop, and it shows what you did that was wrong. And here, the body— Hold on one second. Can you please give him two more minutes? I appreciate that very much, Your Honor. In light of the two minutes, which is generous on your part and I appreciate, I would encourage this court to take a look at a case that we've cited to in our brief for the proposition that sometimes you don't need a prior constitutional violation to have municipal liability. The case is Vineyard v. County of Murray. And I would say to this court— so Vineyard is a very well-structured opinion for the purposes of this analysis because it breaks the concept of a Monell violation based on customer policy, breaks it into headings for the elements of that claim, and the final heading is about the causal connection, which is what Judge Jones says we didn't meet here. And in Vineyard, there was one witness who testified in favor of the plaintiff's causation theory, and it was a law professor, Professor White. If this court looks at what was sufficient in Vineyard to lead to the affirmance of a Monell verdict and then looks at the evidence in this case, our case is stronger than Vineyard. It's stronger than Vineyard because we have the testimony from both of our police chief experts as well as Julio Reyes, Jr., who is the person most knowledgeable provided to us by the City of Atlanta when we said, who can talk to us about this body cam policy? Reyes gets up there and talks about how, yeah, you know what? This does look a little suspicious when an officer turns off a body cam knowing—because I, Julio Reyes, trained Officer Grubbs directly—that if you turn your body cam off, it's going to delete everything that was in buffering mode. And he says, by the way, I'm not aware as the head trainer in the APD, I'm not aware of any scenario in which officers are allowed to turn off their body cam. Grubbs did it three times that day, and the three times he did it all correspond perfectly to things that he wouldn't want other people to see. Going to the bathroom, illegally tasing Mr. Blasingame, causing him to roll down the hill and be rendered a quadriplegic, and then talking to his partner in the moments following that conduct. They have a conversation that, once again, causes Mr. Grubbs to turn off his body cam. Why does he do that, Your Honor? He does it because he knows that body cam was the witness, the only witness, to what I just did. And the City of Atlanta doesn't mind if I get rid of that witness, because they've told us, they've made it clear through their custom and policy, which Reyes agrees exists and both of our experts agree exists. They've made it clear. There's no ramification for me getting rid of that witness that we spent so much money and that is so important to ensuring that law enforcement is done effectively and constitutionally. Okay, Mr. Sussman, thank you very much. I appreciate your time today, Your Honors. Can you give Mr. Melton another two minutes too, please? Thank you, Your Honor. I'll try not to have to use it. I want to borrow from Judge Newsom's arguments. What does the Constitution clearly establish at the time? We have the Bentley case. Assuming the facts in the record most favorable to the plaintiff, we have an incline that elderly man was able to navigate. He rolled down that incline. At what point does the Constitution say that Officer Grubbs cannot tase? At what point does the Constitution speak to that? Not training. Training's a different standard. Not public policy, but the Constitution. The Constitution still doesn't answer that question. Do you agree that, do you, well, let me give you a devil's advocate question. Okay. You say that it's difficult to draw the line, right? And for that reason, Officer Grubbs is entitled to qualified immunity, right?  If you had a hill with a 80% grade, obvious clarity violation? Works both ways. I understand the court's point. I would say this, Your Honor. Whenever we resolve this case, we have to write an opinion explaining. And so the question to you is, if you say that 45 degrees is not enough to provide notice for qualified immunity purposes, what happens to an officer who uses a taser for an individual who's at an 80% hill grade? Here's what I would say. What this court will write in this case will guide officers going forward. Well, I know, but that doesn't matter what we decide. In terms of what's in the law right now, you can't look to law and get the answer to your question. No, but remember, you're also asking us to hold that there's no constitutional violation at all. Okay. So my question to you is, Officer Taze is somebody running down a hill with an 80% grade. Constitutional violation? I will answer it this way, Your Honor. I don't know. But to the extent there is- That's a good answer. To the extent there is, it's not clearly established. That's not my question to you. But I think I answered both. Well, sort of. You can keep going. Going to the training, the argument on Monell liability is not that the city failed to adequately train on tasers. The argument is that they failed to actually train on body cameras. There's not even a requirement to have body cameras in the first instance. If you don't have a body camera, does that mean that there's a Tazing incident, that there's Monell liability? So that's the first point. Second point is, there was training. There was training. And in fact, the stats that- But their claim is not that there wasn't training. Their claim is that people were violating the standards left and right. And by knowing that they could violate the standard for recording left and right, that emboldened them to take action, which was not legal. That's the theory.  And the second point to that is, what they base that argument on are the statistics that the City of Atlanta Police Department itself compiled in order to true up their training. So they are dealing with these issues, and the best evidence that they have of somebody going off the training protocol is incidents like Officer Grubbs. It doesn't mean they're adopted. What did the City of Atlanta do with these statistics? They enhanced their training. That's the whole point. What did the enhanced training tell officers to do? Well, Officer Grubbs was disciplined, for example, for failing to toggle correctly. That's an individual thing. What did the City of Atlanta do with the statistics showing that its officers were just simply not using their body-worn cameras? Continually re-enhanced in the training. Continually re-enhanced in the training. And there was no compilation of the causation that because of whatever was going on with the body cameras, it was resulting in bad tasing incidents. That was not a part of the record. So that's not in there. So you don't have this true evidence. No testimony about that from anybody, that the body-worn camera, their lack of their use was emboldening officers to do that? That was their expert's testimony. Then you can't say that there wasn't testimony. But what I'm saying was there wasn't. I mean, you can say that testimony is not probative. You can say testimony is not persuasive. You can say it's not legally sufficient. But don't tell me that there's no evidence when there's evidence. A number of incidents is what I was trying to refer to. A number of incidents was what I was referring to. You've got to be careful. I hope I said that. I take your honor as an admission. You said it now. I hope I said it the first time. But to the extent I didn't, I wanted to be clear. That's what I was referring to. And so there's not this deliberate indifference that they need to show Monel a liability. And we ask that the court affirm on that basis as well. All right. Thank you both very much. We're in recess for the week.